UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA

VERSUS

KENNETH J. ARDOIN, SR.

CRIMINAL ACTION

NO. 10-29-JJB-CN

**RULING ON DEFENDANT'S MOTION TO SUPPRESS**

This matter is before the Court on Defendants' Motion to Suppress (doc. 20). Plaintiff has filed an opposition (doc. 25). Defendant has also filed a Post-Hearing Memorandum in Support of its Motion to Suppress (doc. 32), to which Plaintiff has filed an opposition (doc. 35). The Court's jurisdiction exists pursuant to 28 U.S.C. § 1331.

On March 16, 2009, at approximately 10:00 p.m., agents of the Livingston Parish Sheriff's Office—Detective Denny Perkins ("Perkins") and five others—visited the home of Gerald Bret Rushing ("Rushing")[1] (Hearing Tr., pgs. 5-7). After discovering that Rushing was not home, Perkins decided to investigate numerous complaints[2] that Defendant Kenneth J. Ardoin, Sr., ("Ardoin")—who lived on the same street as Rushing—was manufacturing and selling methamphetamine from his home (Hearing Tr. pgs. 5-6). On the basis of these

---

[1] The LPSO had arrested Rushing numerous times for manufacturing and selling methamphetamines from his home, and had recently received complaints that he had resumed these activities (Hearing Tr., pg. 7).

[2] Over several months, the Livingston Parish Sheriff's Office received numerous complaints from anonymous sources and tips from three confidential informants (Hearing Tr, pg. 19). Among the informants was an individual who had provided officers with reliable information in the past (Hearing Tr., pg. 22).

complaints, Perkins—though unsure if he possessed sufficient information to obtain a search warrant[3]—decided to conduct a "knock and talk" investigation (Hearing Tr., 19-23).

When the officers pulled up to Ardoin's home—a small "fifth wheel" trailer which was partially visible from the roadway[4]—Ardoin was in his pickup truck, preparing to leave, but was blocked by the officers who had parked behind him (Hearing Tr., pgs. 20-21).  Ardoin exited his vehicle, and approached the officers who were wearing LPSO vests and sidearms (Hearing Tr., pgs. 8, 16, 30). Perkins informed Ardoin that the LPSO was investigating complaints that he was manufacturing and selling methamphetamine from his home and immediately advised Ardoin of his *Miranda* rights, to which Ardoin replied, "Yeah, I understand Miranda" (Hearing Tr., pgs. 8, 43, 72).

Perkins then asked Ardoin if he had anything illegal in his truck and whether the officers could search it, but did not explicitly inform Ardoin that he could refuse to consent to the search (Hearing Tr., pg. 31).  Ardoin responded that he had nothing illegal in the truck and consented to the search (Hearing Tr., pg. 73).  During the course of the search the officers discovered a bag containing methamphetamine, drug paraphernalia and several empty packages of

---

[3] Perkins received information from a confidential informant that he had seen Ardoin making methamphetamine in the house two days earlier (Hearing Tr., pg. 49).  Perkins stated that he "probably could have obtained a search warrant" (Hearing Tr., pg. 50).

[4] Ardoin's trailer was located at the end of a gravel roadway, behind his brother's home (Hearing Tr., pg. 20).  Perkins estimated that Ardoin's brother's home was "a couple hundred feet" down the roadway and that Ardoin's trailer was "[p]robably double or triple that distance"  (Hearing Tr., pgs. 20-21).

2

pseudoephedrine hidden in a toolbox (Hearing Tr., pg. 9). When Perkins asked Ardoin to whom the contraband belonged, Ardoin stated that it belonged to him (Hearing Tr., pg. 10). The officers then placed Ardoin under arrest (Hearing Tr., pg. 35). After being placed under arrest, Ardoin confessed to manufacturing and selling methamphetamine from his home and told Perkins that there was more methamphetamine in his home (Hearing Tr., pgs. 10, 14-15).

Perkins then asked Ardoin if the officers could search his home and presented Ardoin with a written consent form (Hearing Tr., pg. 11). When Ardoin informed Perkins that he was illiterate, Perkins read the contents of the form aloud, after which Ardoin told Perkins that he understood his rights and signed the consent form (Hearing Tr., pg. 11). During the subsequent search, the officers recovered fifty-four firearms—including one machine gun—, supplies for manufacturing methamphetamines, methamphetamines, marijuana, and over $16,000 in cash (Hearing Tr., pgs 12-15). The LPSO officers claim that both they and Ardoin remained calm at all times during the incident. (Hearing Tr., pgs. 9, 16, 79).

On February 25, 2010, Ardoin was indicted on one count of manufacturing methamphetamines (21 U.S.C. § 841(a)(1)), possession of methamphetamine with intent to distribute (21 U.S.C. § 841(a)(1)), possession of firearms in furtherance of drug trafficking (18 U.S.C. § 924(c)(1)(A)), and one count of possession of a machine gun (18 U.S.C. § 922(o)) (doc. 1).

On April 12, 2010, Defendant filed a Motion to Suppress evidence of the controlled substances, paraphernalia and firearms found at his home during the search (doc. 20), and on May 11, 2010, Plaintiff filed an opposition to Defendant's motion (doc. 25).  On June 28, 2010, the Court held an evidentiary hearing (doc. 31).  On August 26, 2010, Defendant filed its Post-Hearing Memorandum in Support of its Motion to Suppress (doc. 32), and on September 29, 2010, Plaintiff filed its opposition thereto (doc. 35).

Defendant argues that the evidence should be suppressed because (1) officers entered into the curtilage of Ardoin's home without a warrant; (2) the officers seized Ardoin without probable cause when they stopped him in his driveway; and (3) Ardoin's consent to the searches of his truck and home was not freely and voluntarily given (doc. 32, pgs. 3-8).

Plaintiff argues that (1) the officers had a reasonable suspicion upon which to approach Ardoin's home to conduct a "knock and talk" investigation; (2) the officers never "seized" Ardoin because they did not engage in any coercive conduct such that Ardoin would not feel free to leave; (3) Ardoin's consent to the searches of his truck and home were consensual based on the totality of circumstances as demonstrated by his uncoerced cooperation and his awareness and knowledge of his *Miranda* rights (doc. 35, pgs. 4-14).

**I. The Officers' Warrantless Entry onto Ardoin's Property**

Defendant argues that the officers violated Ardoin's Fourth Amendment rights by entering the roadway leading up to his trailer without a warrant because the roadway qualifies as the curtilage of his trailer (doc. 32, pg. 3).

The government argues that (1) the roadway does not qualify as "curtilage" of Ardoin's trailer and (2) officers need only have reasonable suspicion in order to conduct a "knock and talk" investigation (doc. 35, pgs. 4-8).

The Fourth Amendment prohibits the government from conducting unreasonable searches and seizures of a citizen's home. *Welsh v. Wisconsin*, 466 U.S. 740, 748 (1984). This prohibition is not limited to the structure of the home itself, but includes the home's curtilage—the area immediately surrounding the home which the owner uses for "intimate activities" and which should be treated as an extension of the home itself. *United States v. Dunn*, 480 U.S. 294, 300-01 (1987). In determining whether an area qualifies as curtilage, courts consider four factors: (1) "the proximity of the area . . . to the home;" (2) "whether the area is included within an enclosure surrounding the home;" (3) "the nature of the uses to which the area is put;" and (4) "the steps taken by the resident to protect the area from observation by people passing by." *Id.* These factors notwithstanding, the Fifth Circuit has consistently held that a driveway is not a curtilage of an individual's home.[5]

---

[5] In *United States v. Moffitt*, 233 F. App'x 409 (5th Cir. 2007), an informant drove onto the defendant's driveway, which was enclosed by a chainlink fence upon which numerous "No Trespassing" signs were posted, and attempted to buy narcotics from the defendant who was sitting in his front yard. *Id.* at 411-12. The *Moffit* court held that the driveway was not a

5

The Court finds that Defendant's driveway was not a curtilage of his home. The driveway—though terminating at his home—extended hundreds of feet out to a public roadway (Hearing Tr., pgs. 20-21). Nothing in the record indicates that either Defendant's home or the roadway leading up to it were enclosed. Nor does the record indicate that Defendant used the roadway for any intimate purpose. Lastly, though Defendant's home was only partially visible from the public street (Hearing Tr., pg. 21), the record fails to indicate that Defendant took any steps to shield the *roadway* from observation by passers-by. Therefore, the Court finds that Defendant's roadway does not qualify as a curtilage.

Though the roadway is not a curtilage, and is therefore not subject to the heightened standards applicable to homes, the officers still must have had a reasonable suspicion upon which to approach Ardoin's home to conduct a "knock and talk" investigation.[6] If the officer has a reasonable suspicion of criminal

---

curtilage—despite its proximity to defendant's house and its being enclosed by a fence—because of the nature to which it was put to use: "[the defendant's] driveway and front yard were access areas for visitors to enter and knock on the front door." *Id.* at 411-12.  The *Moffit* court also stated that the defendant did not take sufficient steps to protect the alleged curtilage from observation by passers-by because the chain-link fence was see-through. *Id.* at 412. *See also, United States v. Alvarez*, 213 F.3d 636, 636 (5th Cir. 2000) (upholding district court's finding that the defendant's driveway was not a curtilage because the driveway was open to the plain view and use of passers-by in that the defendant had not taken steps to enclose it); *United States v. Kessler*, 165 F.3d 24 (upholding district court's finding that the defendant's driveway was not a curtilage when the defendant had not taken steps to enclose the driveway or otherwise indicate that it was not open to public use); *U.S. v. Ramirez*, 145 F. App'x 915, 921 (5th Cir. 2005) (finding that a canal was not a curtilage of the defendant's home where the canal was not used by the defendant for any intimate purpose and was accessible to the public from public streets).

[6] *See United States v. Jones*, 239 F.3d 716, 720 (5th Cir. 2001) ("Federal courts have recognized the 'knock and talk' strategy as a reasonable investigative tool when officers seek to gain an occupant's consent to search or when officers reasonably suspect criminal activity."). *See also*, *United States v. Toblin*, 923 F.2d 1506, 1511 (11th Cir. 1991), *cert. denied*, 502 U.S.

activity, the officer may approach an individual's home, knock on the door, and talk to the home's occupants, and the Fourth Amendment is not implicated because no search or seizure occurs.  *United States v. Walters*, 529 F. Supp. 2d 628, 636 (E.D. Tex. 2007).  Reasonable suspicion sufficient to validate a "knock and talk" investigation may be based upon complaints or tips that an individual's home is being used for drug activity.  *Jones*, 239 F.3d at 718, 720.

  The Court finds that the officers had a reasonable suspicion that Ardoin was manufacturing and selling methamphetamines from his home.  The officers received numerous complaints regarding Ardoin's activities.  (Hearing Tr., pgs. 85).  And though anonymous tips and complaints are not necessarily sufficient to support a finding of reasonable suspicion, the tips and complaints here were bolstered by information obtained from confidential informants, at least one of whom had previously provided reliable information on a number of occasions (Hearing Tr., pgs. 21, 49).  *See Alabama v. White*, 496 U.S. 325, 330-31 (1990) (discussing reasonable suspicion standard and reliability of information obtained from informants in the context of an investigatory stop); *United States v. Laury*, 985 F.2d 1293, 1312 (5th Cir. 1993) (stating that the reliability of an informant's information may be assessed from the accuracy of previously provided information).  Based on the information they received, the Court finds that the officers had a reasonable suspicion that Ardoin was manufacturing and selling

---

907 (1991) ("Reasonable suspicion cannot justify the warrantless search of a house, but it can justify the agents' approaching the house to question the occupants.").

methamphetamines from his home, and therefore had a proper basis upon which to approach Ardoin's home.

## II. The Officers' Alleged Seizure of Ardoin

Defendant argues that the officers seized Ardoin by parking their cars behind him as he was pulling out of his driveway and approaching him to discuss the complaints against him (doc. 32, pg. 5). Defendant further argues that the officers did not have a reasonable suspicion upon which to seize Ardoin (doc. 32, pg. 6).

The government argues that the officers did not unlawfully seize Ardoin because their conduct—which they describe as calm and non-threatening—could not have led Ardoin to believe that he was not free to leave (doc. 35, pgs. 11-12).

The Fourth Amendment prohibits unreasonable seizures of individuals. A person is seized—and the Fourth Amendment implicated—only if a reasonable person would conclude, in light of the circumstances, that he was not free to leave. *Terry v. Ohio*, 392 U.S. 1, 19 (1968). Generally speaking, a seizure occurs "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *Id.* In determining whether a seizure has occurred a court may consider any number of factors including: "(1) the threatening presence of several officers; (2) the display of a weapon by an officer; (3) physical touching of the person of the citizen; and (4) the use of language or tone of voice indicating that compliance with an officer's request might be compelled." *United States v. Mask*, 330 F.3d 330, 337 (5th Cir. 2003)

(citing *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)). Though there are not many cases with similar facts in the Fifth Circuit, other courts of appeals have found that no seizure occurred under similar circumstances.[7]

The Court finds that officers did not seize Ardoin. On the night of his arrest, six officers, in three separate police units pulled up and parked behind Ardoin and effectively blocked him in as he was attempting to leave (Hearing Tr., pgs. 5, 7-8, 26). However, nothing in the record indicates that the officers touched Ardoin (Hearing Tr., pgs. 16, 79). Nor does the record indicate that the officers spoke to him in a hostile or coercive manner (Hearing Tr., pgs. 16, 79). Moreover, though the officers' firearms were visible in their holsters, nothing in the record suggests that the officers removed or brandished their weapons (Hearing Tr., pgs. 25, 30, 34, 70, 89). Therefore, based on the totality of circumstances, the Court finds that Ardoin was not seized when the officers parked behind him and engaged in a discussion with him.

## III. Ardoin's Consent to the Searches of His Vehicle and Home

Defendant argues that Ardoin's consent to the searches of his vehicle and home, which yielded the evidence sought to be suppressed, are invalid because it was not freely or voluntarily given.

---

[7] *See, e.g., United States v. Dockter*, 58 F.3d 1284, 1286-1287 (8th Cir. 1995) (finding no seizure where an officer blocked defendant's vehicle and activated flashing lights because the officer did not display his weapon, did not touch the defendant and did not employ language or tone indicating that compliance with the officer's request might be compelled); *United States v. Kim*, 25 F.3d 1426, 1430 (9th Cir. 1994) (finding no seizure when a DEA agent partially blocked defendant's vehicle from exiting shopping center because DEA agent did not otherwise engage in coercive tactics).

Though an officer must generally obtain a warrant to conduct a search of an individual's home or vehicle, an exception to the warrant requirement exists for searches conducted with the consent of the individual. *Schneckolth v. Bustamonte*, 412 U.S. 218, 219 (1973). The government bears the burden of proving by a preponderance that the individual's consent was freely and voluntarily given, both of which are questions of fact to be determined by the totality of the circumstances using an objective standard. *Florida v. Jimeno*, 500 U.S. 248, 251 (1991); *United States v. Santiago*, 410 F.3d 193, 199 (5th Cir. 2005); *United States v. Gonzales*, 121 F.3d 928, 938 (5th Cir. 1997). In determining the voluntariness of an individual's consent the court considers: "(1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse to consent;[8] (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found." *Santiago*, 410 F.3d at 199.

The Court finds that Ardoin consented to the search freely and voluntarily. At the time Ardoin consented to the search of his vehicle, his interaction with the officers was completely voluntary; nothing in the record indicates that Ardoin was not free to leave or end the questioning. Though Perkins read Ardoin his *Miranda* rights from the outset of their discussion, Ardoin was not told that he

---

[8] That a defendant was not affirmatively informed of his right not to consent to a search does not compel a finding that the consent was involuntary. *United States v. Valentine*, 401 F.3d 609, 613 (5th Cir. 2005).

10

was under arrest or handcuffed prior to consenting to the search (Hearing Tr., pg. 42). Moreover, though Perkins did not explicitly inform Ardoin that he was free to refuse consent, the record fails to demonstrate that the officers used coercive practices, such as drawing their weapons or using hostile language (Hearing Tr., pgs. 16, 31, 79). At the time Ardoin consented to the search of his home, he was under arrest, however, when asked whether there was additional contraband in the house, he replied that there was and freely consented when asked to provide written consent to the search (Hearing Tr., pg. 76). According to the officers' testimony, Ardoin remained calm throughout their interactions (Hearing Tr., pg. 16).

   Moreover, Ardoin appears to have fully cooperated with the officers with little hesitation. Nothing in the record indicates that he was unwilling to speak with the officers when they arrived. When the officers located the contraband in his vehicle he freely admitted that it was methamphetamine, and when the officers asked him if there was any contraband in his home he responded that there was likely more methamphetamines therein (Hearing Tr., pg. 10). Ardoin freely explained to officers how he manufactured methamphetamines and details regarding the purchasing and functioning of the machine gun (Hearing Tr., pgs. 14, 15, 57). Though Ardoin is illiterate, when he informed the officers of this, the officers read the contents of the search warrant waiver to him aloud, after which Ardoin said he understood what had been read and signed the form (Hearing Tr., pgs. 10-11).

Ardoin also understood that he could refuse the officers' request to search. When the officers read him his *Miranda* rights he stated that he fully understood them, and consented to the search of his vehicle nonetheless (Hearing Tr., pgs. 8, 72). In addition, Ardoin had been arrested and read his *Miranda* warnings on at least three prior occasions, and on one occasion, six-months earlier, he refused the arresting officer's request to search his home (Hearing Tr., pg. 51; U.S. Exhibit 4). And though illiterate, there is no indication in the record that Ardoin suffers from diminished mental capacity.

## **Conclusion**

Because Defendant has failed to establish that (1) the officers lacked adequate grounds to conduct a "knock and talk" investigation; (2) he was "seized" without reasonable suspicion; or (3) his consent to the search of his vehicle and home were not freely and voluntarily given the Court DENIES Defendants Motion to Suppress (doc. 20).

Signed in Baton Rouge, Louisiana, on this 14th day of October, 2010.

**JUDGE JAMES J. BRADY**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**